## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

UNITED STATES OF AMERICA,

  Plaintiff,

vs.                                                                    JURY TRIAL DEMANDED

ALL RIGHT TO AND INTEREST IN PNC
CORPORATE PLAZA HOLDINGS LLC HELD,
CONTROLLED, OR ACQUIRED, DIRECTLY
OR INDIRECTLY, BY OPTIMA CBD
INVESTMENTS LLC AND/OR CBD 500 LLC,
INCLUDING ANY INTEREST HELD IN OR
SECURED BY THE REAL PROPERTY AND
APPURTENANCES LOCATED AT 500 WEST
JEFFERSON STREET, LOUISVILLE, KY 40202;
ANY RIGHT TO COLLECT AND RECEIVE ANY
PROFIT, RENT, INCOME, AND PROCEEDS
THEREFROM; AND ANY INTEREST DERIVED
FROM THE PROCEEDS INVESTED IN PNC
CORPORATE PLAZA HOLDINGS LLC BY OPTIMA
CBD INVESTMENTS LLC AND/OR CBD 500 LLC,

  Defendant.

_____/

### VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its undersigned attorneys and in accordance with Rule G

of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, brings

this complaint for forfeiture *in rem* and alleges the following:

### NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit assets that facilitated, were involved in, and

are traceable to an international conspiracy to launder money embezzled and fraudulently obtained

from PrivatBank.

1

2.      The misappropriated funds were used to purchase real property in Louisville, Kentucky, namely, the building known as PNC Plaza and located at 500 West Jefferson Street, Louisville, KY 40202 ("PNC Plaza").

3.      Following a restructuring, PNC Plaza is owned by PNC Corporate Plaza Holdings LLC, of which a 95% interest is owned by Optima CBD Investments LLC via CBD 500 LLC.  The United States seeks forfeiture of all right to and interest in PNC Corporate Plaza Holdings LLC held, controlled, or acquired, directly or indirectly, by Optima CBD Investments LLC and/or CBD 500 LLC, including any interest held in or secured by the real property and appurtenances located at 500 West Jefferson Street, Louisville, Kentucky 40202; any right to collect and receive any profit, rent, income, and proceeds therefrom; and any interest derived from the proceeds invested in PNC Corporate Plaza Holdings LLC by Optima CBD Investments LLC and/or CBD 500 LLC (the "Defendant Asset").

4.      The United States seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(C), because it is traceable to violations of U.S. law and specified unlawful activity, including violations of 18 U.S.C. §§ 1956, 1957, 2314, and 2315.

5.      The United States also seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(A), because it was involved in and facilitated one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

6.      The specified unlawful activity includes fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the transportation, receipt, concealment, possession, sale, and disposal of misappropriated money in international commerce (18 U.S.C. §§ 2314 and 2315); and conspiracy to commit those actions.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

8.      Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture took place in the Southern District of Florida.  Those include, but are not limited to, several of the entities involved in the criminal activity having a principal place of business in Miami, important documents related to the criminal activity being executed and notarized in Miami, and entities and individuals using Miami addresses in connection with the criminal activity.

**PEOPLE AND ENTITIES**

9.      The Plaintiff is the United States of America.

10.     The Defendant Asset is all right to and interest in PNC Corporate Plaza Holdings LLC held, controlled, or acquired, directly or indirectly, by Optima CBD Investments LLC and/or CBD 500 LLC, including any interest held in or secured by the real property and appurtenances located at 500 West Jefferson Street, Louisville, Kentucky 40202, any right to collect and receive any profit, rent, income, and proceeds therefrom, and any interest derived from the proceeds invested in PNC Corporate Plaza Holdings LLC by Optima CBD Investments LLC and/or CBD 500 LLC.

11.     PrivatBank is a Ukrainian financial institution located in Ukraine, with a branch in Cyprus and an affiliated entity in Latvia, among other places.  PrivatBank is one of the largest banks in Ukraine.  From 2003 to 2016, it accounted for approximately 25% of the banking sector in the country, and held deposits in excess of $6 billion, which comprised approximately 33% of individual deposit accounts in Ukraine.  Extensive audits by the National Bank of Ukraine ("NBU") in 2016 uncovered a scheme by the bank's owners to steal over $5 billion from the bank

via the issuance of fraudulent loans.  As a result of the massive theft and fraud, PrivatBank was nationalized in December 2016.

12.     Ihor Kolomoisky is a billionaire Ukrainian oligarch.  He controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media, under the umbrella of the "Privat Group."  Before the nationalization of PrivatBank, he was one of the two primary owners of the bank, holding more than 40% of the bank's shares, and was a member of the bank's Supervisory Board.  He exercised extensive control over the bank and its activities.  Kolomoisky was the governor of Dnipropetrovsk province in Ukraine from 2014 to 2015.

13.     Gennadiy Boholiubov is another Ukrainian oligarch who shares in the ownership of many business entities with Kolomoisky under the Privat Group.  He was the second major shareholder of PrivatBank along with Kolomoisky.  Before nationalization, he owned more than 40% of PrivatBank and was a member of PrivatBank's Supervisory Board.  He, together with Kolomoisky, exercised extensive control over the bank and its activities.

14.     Mordechai Korf, also known as "Motti," is a Miami-based business associate of Kolomoisky and Boholiubov.  He helped to acquire and manage the Ukrainian oligarchs' business empire in the United States, which included ferroalloy companies and real estate holdings in Ohio, Florida, Kentucky, and West Virginia, among other places.  Along with Kolomoisky and Boholiubov, Korf was a part owner of dozens of U.S. entities, for which he often acted as President and CEO.  The companies owned and controlled by Korf generally share variations of the name "Optima."  Korf was also a part owner of PrivatBank's Latvia affiliate.

15.     Uriel Laber is another Miami-based associate of Kolomoisky and Boholiubov, and is Korf's business partner.  He worked with Korf to acquire and manage US-based entities for Kolomoisky and Boholiubov under the "Optima" umbrella of companies.  Laber also serves on

4

the supervisory board of Ukrnafta, a Ukrainian oil and gas company, in which Privat Group has a significant share.  Like Korf, Laber was a part owner of PrivatBank's Latvia affiliate.

16.     The interests of Mordechai Korf, Uriel Laber, Ihor Kolomoisky, and Gennadiy Boholiubov may be adversely affected by these proceedings.

## FACTUAL ALLEGATIONS

17.     Over the course of more than a decade, Ihor Kolomoisky and Gennadiy Boholiubov used their control of PrivatBank to steal billions of dollars of the bank's funds.  The magnitude of the fraud and theft was so great that NBU was forced to bail out the bank by providing $5.5 billion in order to stave off economic crisis for the whole country.

18.     The basic idea was simple: Kolomoisky and Boholiubov requested money from PrivatBank, which (based on their control and ownership) they always received, and rarely paid it back, except through new loans.

19.     The mechanics of the scheme were complex.  Kolomoisky and Boholiubov used a substantial collection of companies they owned or controlled to apply for loans from PrivatBank. An army of functionaries at PrivatBank then papered and processed the loans as if they were legitimate.   A "special" credit committee at the bank approved the loans (despite misrepresentations in the applications).   The loan proceeds were then divided, combined, and transferred through a vast network of companies, generally using accounts at PrivatBank's Cyprus branch, to thoroughly disguise their nature, source, ownership, and control.  Eventually, the money was sent all over the world.  When the loans came due, other loans were used to pay off the old loans, or, in some cases, they were repaid with income from the investment of the misappropriated funds.  The lack of repayment led to the bank's loss of billions of dollars.

20.     Kolomoisky and Boholiubov further laundered the money by investing in the United States.  They enlisted Mordechai Korf and Uriel Laber, who had previously run businesses in Ukraine and the US, for that purpose.  Korf and Laber established a network of companies, generally under some variation of the name "Optima," to acquire businesses and real estate in the US using the misappropriated money from PrivatBank.

21.     Using Korf and Laber's network, Kolomoisky and Boholiubov spent prolifically: they purchased more than five million square feet of commercial real estate in Ohio, steel plants in Kentucky, West Virginia, and Michigan, a cellphone manufacturing plant in Illinois, and commercial real estate in Texas, among others.

22.     In 2011, they purchased the building known as PNC Plaza at 500 West Jefferson Street in Louisville, Kentucky.  The money used to purchase PNC Plaza was directly traceable to two loans obtained from PrivatBank by Kolomoisky and Boholiubov, and was the proceeds of embezzlement, misappropriation, and fraud.

23.     Despite a steady stream of misappropriated funds for investment, Korf and Laber often failed to turn a profit with their US ventures.  Several went into bankruptcy, were foreclosed on, or otherwise failed.  PNC Plaza was no exception.  In 2018, facing a foreclosure action, Korf and Laber injected money from the Optima network into the property and entered a joint venture to keep it afloat.  The "restructuring" of the property's ownership allowed them to further launder the misappropriated funds.

24.     Having converted the misappropriated money from PrivatBank into real property, Korf and Laber decided to re-convert the real property into money.  In 2019, they received an offer to sell PNC Plaza, and, on July 23, 2020, they agreed to a sale price of $22.25 million.

I.      **Kolomoisky and Boholiubov Stole Billions from PrivatBank**

      A.      **Kolomoisky and Boholiubov Controlled PrivatBank.**

25.     Kolomoisky and Boholiubov founded PrivatBank in 1992.  By 2008, and through 2016, each owned roughly 45% of the bank.

26.     Kolomoisky and Boholiubov exercised control over PrivatBank as its majority shareholders.  The "general meeting" of shareholders was the highest decision-making authority of PrivatBank, and Kolomoisky and Boholiubov controlled approximately 90% of the "votes." Through that authority, they could, among many other things, appoint and remove members of the Supervisory Board and the Audit Committee, and change the bank's bylaws.

27.     Kolomoisky and Boholiubov also exercised control through their domination of PrivatBank's Supervisory Board.  From at least 2010 to mid-2015, Kolomoisky and Boholiubov were two of the three members of the Supervisory Board, and Boholiubov was the Chairman.  That gave them unchecked power over the Board's decisions.[1]

28.     The Supervisory Board was tasked with the selection and removal of members of PrivatBank's management.  Kolomoisky and Boholiubov used that authority to install their lieutenants in key roles at PrivatBank—particularly in positions that decided on disbursement of the bank's money.

29.     The Supervisory Board also had the responsibility to approve high-value loans, and was obligated to protect the bank's interests.  Contrary to those interests, the Board routinely signed off on loan applications to entities owned and controlled by Kolomoisky and Boholiubov.

---

[1]     In late 2015, as discussions with NBU began, and nationalization became a possibility, additional members were added to the Supervisory Board.  Yet Kolomoisky and Boholiubov continued to control the Supervisory Board and the bank—as majority shareholders, they had the power to appoint and remove members of the Supervisory Board.

30.     The Supervisory Board was also charged with selecting the bank's auditor and with determining the agenda for audits.  It thus fell to Kolomoisky and Boholiubov, and their hand-selected subordinates, to ensure that the bank complied with Ukrainian law and that no one was pilfering its resources.

31.     To control the bank's daily activities, Kolomoisky and Boholiubov installed loyal associates to head the management of PrivatBank.  One of those individuals was Manager 1.  Another was Manager 2, who was frequently referred to as "Kolomoisky's Treasurer" or his right-hand man.  Manager 2 served as the Head of PrivatBank's Investment Business and as First Deputy Chairman of PrivatBank's Management Board from 2002 until December 2016.  In those positions, he acted at the direction and for the benefit of Kolomoisky and Boholiubov.[2]

32.     Kolomoisky and Boholiubov had a reputation in Ukraine that led employees of PrivatBank to follow orders.  Kolomoisky in particular was known for ruthlessness and even violence that inspired loyalty—while he was governor of Dnipropetrovsk province, he was known to have paid armed goons to take over the offices of a state-owned oil company.  The employees of the bank understood that management's instructions were Kolomoisky and Boholiubov's orders, and orders were followed.

33.     If employees did express dissent, they would lose their bonuses, have work taken away, or simply be fired.  Those consequences were particularly harsh in context: PrivatBank offered the highest paying jobs in the region.

---

[2]     Manager 2 also assisted in managing Kolomoisky and Boholiubov's investment of the misappropriated funds from PrivatBank in the US.  For instance, he was involved in a decision to lend funds to Warren Steel Holdings LLC, which is ultimately beneficially owned by Kolomoisky, Boholiubov, Korf, and Laber.

34.     During the nationalization process in 2016, NBU and its representatives dealt primarily with Kolomoisky and Boholiubov in negotiating the terms of the agreement.  NBU and others understood that Kolomoisky and Boholiubov were in control.

35.     At the end of the nationalization process, Kolomoisky and Boholiubov signed a letter on December 16, 2016 personally taking responsibility for the changes that PrivatBank was required to undertake.  Kolomoisky and Boholiubov promised to ensure that the Ukrainian government would have full access to buildings and operational and information systems of the bank and to ensure the restructuring of outstanding loans.  They also promised not to interfere with the activity of the bank in the future, or to put pressure on the government or the leadership of the bank.  They did not fulfill those promises.

**B.     Kolomoisky and Boholiubov Embezzled Money and Defrauded the Bank.**

36.     Despite having significant wealth, Kolomoisky and Boholiubov devised a scheme to take the bank's funds—money entrusted to it by ordinary depositors—for themselves.

37.     To that end, they converted a department within PrivatBank to service accounts for them and their companies.  The department was called "BOK," or "Business Client Management," and was headed by Manager 1.

38.     Kolomoisky and Boholiubov, with the assistance of Manager 1, Manager 2, and others, caused PrivatBank (via BOK) to issue billions of dollars in loans to companies they owned or controlled ("related parties").  The related parties included, among others, Zaporozhye Ferroalloy Plant ("ZFZ"), Nikopol Ferroalloy Plant ("NZF"), and Ordzhonikidze Mining & Processing Plant ("OGZK"), all of which were owned by Kolomoisky and Boholiubov.

39.     For instance, loan applications totaling more than $126 million were submitted under NZF's name in 2010 alone.  Examples include:

| Loan Number | Date | Amount |
|---|---|---|
| 4N10122D | 7/1/2010 | $14,000,000 |
| 4N10130D | 7/1/2010 | $14,000,000 |
| 4N10121D | 7/1/2010 | $14,000,000 |
| 4N10149D | 8/2/2010 | $14,000,000 |
| 4N10221D | 9/1/2010 | $14,000,000 |
| 4N10224D | 9/1/2010 | $14,000,000 |
| 4N10220D | 9/1/2010 | $14,000,000 |
| 4N10261D | 10/1/2010 | $14,000,000 |
| 4N10263D | 10/1/2010 | $14,000,000 |

40.     During the same period, loan applications totaling more than $21 million were submitted under ZFZ's name.  Examples include:

| Loan Number | Date | Amount |
|---|---|---|
| 4Z10282D | 10/1/2010 | $1,000,000 |
| 4Z10283D | 11/1/2010 | $9,300,000 |
| 4Z10269D | 10/1/2010 | $1,000,000 |
| 4Z10270D | 10/1/2010 | $1,000,000 |
| 4Z10330D | 11/30/2010 | $9,300,000 |

41.     And in 2010 and 2011, loan applications totaling approximately $90 million dollars were submitted under OGZK's name.  Examples include:

| Loan Number | Date | Amount |
|---|---|---|
| 4O10091D | 4/1/2010 | $50,000,000 |
| 4O11037D | 2/1/2011 | $40,000,000 |

42.     Kolomoisky and Boholiubov also caused hundreds of millions of dollars in loans to be issued to entities they owned that conducted little or no business at all, and which effectively existed only to steal from PrivatBank and launder the misappropriated funds.  Examples include:

| Loan Number | Date | Amount |
|---|---|---|
| CY001I/4 | 2/4/2013 | $20,000,000 |
| CY00XC/12 | 2/18/2015 | $3,132,000 |

43.     By the time the bank was nationalized in 2016, approximately 97% of the corporate loans outstanding were to businesses owned or controlled by Kolomoisky and Boholiubov.

44.     Unlike the other 3% of loans—the legitimate loans—the related parties' loan applications and files were prepared by PrivatBank employees working as part of BOK, a separate department of the bank.

45.     The loan applications were almost always fraudulent.  The most glaring misrepresentation was the stated "purpose" of the loan.  The applications submitted by the related parties often claimed that the purpose was to fund ongoing operations of the business entity applying for the loan.  Instead, the money was sent wherever Kolomoisky and Boholiubov wanted, and was often used *by a completely different entity*, for whatever purpose they devised.  Those misrepresentations were material: the loan agreements stated that the loans must be used for the purpose stated in the application.

46.     For instance, the application for Loan No. 4Z1195D for $14,850,500 stated that the loan's purpose was "funding ongoing operations" of ZFZ, which produced ferroalloys in Ukraine. Instead, a significant portion of the loan was used by Pavanti Enterprises Limited ("Pavanti"), a Kolomoisky-owned entity with an account at PrivatBank Cyprus, to purchase a commercial building in downtown Cleveland, Ohio.

47.     Other examples of misrepresentations related to the purpose of the loan include:

| Loan No. | Amount | Misrepresentation of the Loan's Purpose |
|---|---|---|
| CY001I/4 | $20,000,000 | The stated purpose of the loan was "the replenishment of floating assets . . . including, for manganese ore;" instead, the funds were used to purchase Kentucky Electric Steel, a steel plant in Kentucky. |
| 4N1212D | $12,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to the production of ferroalloys in Ukraine; instead, the funds were used to purchase One Cleveland Center, a commercial high rise in Cleveland, Ohio. |

| 4N09128D | $14,000,000 | The stated purpose of the loan was "[f]inancing current activities" related to the production of ferroalloys in Ukraine; instead, a portion of the funds were sent to Korf and Laber's personal accounts. |
| 4A1531D | $60,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to wholesale and retail trade; instead, a portion of the funds was used to purchase a Motorola manufacturing facility in Harvard, Illinois. |

48.     Those misrepresentations constituted a fraud by and on PrivatBank.  PrivatBank was put at serious financial risk and was harmed because of those lies, which violated Ukrainian law and PrivatBank's internal policies.

49.     The applications contained additional misrepresentations.  Generally, they stated that the loans would be repaid with income earned through current business activities.  Instead, in many instances, the loans were repaid with the proceeds of other loans.  In that way, the loans were "recycled," and PrivatBank was never made whole—it simply kept lending more money to pay back the old loans, which eventually led to the more than $5 billion shortfall.

50.     Again, there are numerous examples of that fraudulent activity, which include:

| Loan No. | Amount | Misrepresentation of the Source of Repayment |
| --- | --- | --- |
| 4N09129D | $14,000,000 | The loan application stated that the loan would be repaid via funds earned through ferroalloy production; instead, it was repaid with funds from two other loans. |
| 4D09111I | 500,000,000 UAH[3] | The loan application stated that the loan would be repaid via funds earned through ongoing operations; instead, it was repaid with funds from two loans to other related parties. |

51.     Those misrepresentations constituted a fraud by and on PrivatBank.  The source of loan repayment was material as a part of the bank's risk assessment.  The entities that took the loans were, in many cases, not actually conducting business—they were shells, and could not repay loans through their "business activities."  Although on paper, certain loans were paid when they

---

[3]     Eight months after the loan was issued, the loan amount was increased to 750,000,000 UAH, or approximately $92 million at the 2009 exchange rate.

came due, in reality, they were being paid through the issuance of additional debt, and so PrivatBank was simply recycling the loans and increasing its losses.

52.     Additionally, the loan applications contained misrepresentations related to the collateral securing the loan.  Like the source of loan repayment, the nature and value of collateral was material to the bank's decision to issue a loan.

53.     For example, the application for Loan No. CY001I/4 for $20 million by Veroni Alloys LLC ("Veroni"), a Kolomoisky-owned shell entity, referenced collateral in the form of the goods to be traded based on contracts between Veroni and Halefield Holdings Limited ("Halefield"), another shell company owned and controlled by Kolomoisky and Boholiubov.  The contract provided that Veroni would purchase $122,500,000 of Australian manganese ore from Halefield and sell it to Hangli International Holdings Limited ("Hangli"), another shell entity controlled by Kolomoisky and Boholiubov.  No such purchases or sales of Australian manganese occurred.

54.     Frequently, the "loans" taken by Kolomoisky and Boholiubov's entities were lines of credit—a source of funds that could be drawn on whenever convenient.  The lines of credit, by their terms, were supposed to be used to fund ongoing business of the entities that received them. However, they functioned instead as slush funds—a big pot of money that Kolomoisky and Boholiubov drew on for whatever purpose they wanted, and often used to send cash to the United States for investment by unrelated entities.

55.     For instance, Loan No. 4Z10330D was a line of credit for $9,300,000 to ZFZ, an entity owned by Kolomoisky and Boholiubov.  Between December 2010 and December 2011, ZFZ debited over $19.9 million against the line of credit.

13

56.    When it came time to pay back the debt, Kolomoisky and Boholiubov often repaid the lines of credit by taking out additional loans.  In the case of Loan No. 4Z10330D, nearly $8 million of the repayment came from other loan proceeds.

57.    When Kolomoisky and Boholiubov's entities applied for those "second tier" loans, they did not disclose that they would use them to pay back prior loans.  That lack of disclosure worked a fraud on PrivatBank and increased its risk and eventual losses.

58.    At PrivatBank, there were two different committees that reviewed loan applications.  There was an "active credit committee," which was responsible for consumer credit. The members of the committee met in person, deliberated about the bank's lending activity, and considered PrivatBank's written policies.  They required documentation and conducted inquiries before issuing loans.

59.    Kolomoisky and Boholiubov went to the *other* credit committee to get their loans approved.  That was a "remote" or "electronic" credit committee, which reviewed applications for related party loans.  The committee did not meet in person to discuss the loans; rather, it held electronic "meetings" via a system called PrivatDoc.

60.    The "electronic" committee consisted of certain PrivatBank employees who were otherwise entirely uninvolved in the loan approval process.  Those employees understood that their role was simply to "sign" the loan electronically.  Rather than conducting a thorough inquiry, members of the electronic credit committee simply hit "approve" whenever they received a loan application from one of Kolomoisky or Boholiubov's companies.  Signing off on the loans was "like opening the door and walking into the office," as one employee stated.  They conducted no analysis or evaluation of the loans or associated documents as required by bank policy, and were expected not to do so.

61.     That lack of review is thrown into particularly sharp relief by the treatment of collateral for loans to Kolomoisky and Boholiubov's entities.  In multiple instances, PrivatBank employees noted that additional work was needed to verify collateral, and yet the loan was approved the very same day, without further investigation or amendment.

62.     Examples of the electronic credit committee disregarding collateral requirements for loans for Kolomoisky and Boholiubov's entities, which would have been applied by the regular credit committee, include:

| Loan No. | Amount | Misrepresentation of the Collateral |
|----------|--------|-------------------------------------|
| 4N09129D | $14,000,000 | Internal paperwork noted that collateral had not been provided for the loan; nevertheless, the loan was approved that same day and signed by Boholiubov as chairman of the Supervisory Board. |
| 4A1532D | $46,500,000 | Internal paperwork noted that it needed information on contracts referenced as collateral and could only approve the loan once that was received; nevertheless, the loan was approved that same day. |
| 4O10091D | $50,000,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |
| 4N11415D | $13,500,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |

63.     The dual approach—one for entities owned and controlled by Kolomoisky and Boholiubov, and one for most everyone else—was evident in the loan packages.  NBU's investigation found that, while legitimate loan packages might contain "a huge book" of documents analyzing collateral for a multi-million-dollar loan, the package for loans to Kolomoisky and Boholiubov's entities might have as little as "just one page."

64.     Kolomoisky and Boholiubov's misappropriation of the bank's funds constituted embezzlement and conversion.  The funds had been entrusted to the bank by ordinary depositors and legitimate businesses; Kolomoisky and Boholiubov siphoned them off, effectively using

PrivatBank as their personal piggybank, and never expected to have to pay the money back.[4] They used loyal insiders to effectuate the theft from the bank and its depositors.

65.     Kolomoisky and Boholiubov's misappropriation of the bank's funds also constituted a fraud on the bank.  The many material misrepresentations allowed them to take the money to use as they wanted, without restriction, and hid the misuse of funds from regulators, depositors, auditors, and others.

66.     Kolomoisky and Boholiubov's also constituted a fraud by the bank, because the bank gave funds entrusted to it to Kolomoisky and Boholiubov's entities, putting the depositors at great risk and misusing their money.

**C.     Kolomoisky and Boholiubov's Actions Violated Ukrainian Law.**

67.     Kolomoisky and Boholiubov's conduct violated numerous provisions of the Ukrainian Criminal Code, including the following:

68.     Article 190 prohibits "Taking possession of somebody else's property or obtaining the property title by deceit or breach of confidence (fraud)."

69.     Article 191 prohibits "Misappropriation, embezzlement or conversion of property by abuse of office."

70.     Article 209 prohibits laundering the proceeds of a crime.

71.     Article 218-1 makes it illegal to drive a bank into insolvency.

72.     Article 219 makes it illegal to drive a business entity into insolvency.

73.     Article 220-2 prohibits the falsification of financial documents and reports of a financial organization.

---

[4]     In fact, just before the bank was nationalized, loans to entities owned or controlled by Kolomoisky and Boholiubov were restructured, effectively delaying the repayment of outstanding debt for almost another decade.

74.     Article 222 prohibits fraud with financial resources.

75.     Article 364-1 prohibits the abuse of power by an official of a private legal entity.

76.     Kolomoisky and Boholiubov's embezzlement and fraud, and the actions they took at PrivatBank to further their scheme, violated those provisions and others.

**D.     Kolomoisky and Boholiubov Laundered the Loan Proceeds.**

77.     Once the loan or line of credit funds were disbursed, they were quickly combined, divided, and comingled in a labyrinth of accounts all over the world.  The dizzying series of transfers was designed to disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

78.     The entities that transferred the funds were often shells; they did no business, had no offices or employees, and existed to shuttle money from place to place while disguising it.

79.     Many of the shell companies used the same address.  For instance, in "Know Your Customer" records provided to PrivatBank, at least 56 separate entities claimed to be located at Archiepiskopou Makariou Ill Avenue, 155 Proteas House in Limassol, Cyprus.  They also used the same few registered agents repeatedly: Icaza, Gonzalez Ruiz & Aleman (BVI) Trust Limited was listed as the registered agent for 12 separate shell entities, and Equity Management & Accountancy Corp was listed as the registered agent for 16 shell entities.  The same two authorized signers (neither of whom was Kolomoisky or Boholiubov) together appear for 48 different shells entities.

80.     In the same records, Kolomoisky and Boholiubov were listed as the beneficial owners of 35 shell entities that were used to transfer money misappropriated from PrivatBank.  At least 96 entities used in those transactions shared a secretary, director, signer, registered agent,

shareholder, or address with one of the entities overtly owned by Kolomoisky and Boholiubov, and many shared multiple individuals in common.

81.    PrivatBank employees were compelled to act as officers and directors of those shell companies and were instructed to sign documentation to that effect.  At least 59 different shell entities listed PrivatBank employees as officers or directors.  Those employees were not bona fide officers and directors—they exercised no duties and responsibilities of officers and directors of the companies, which were empty shells.

82.     Once the funds were taken from PrivatBank, they were transferred quickly among dozens of the shell entities, often in a matter of minutes.  The Cyprus branch of PrivatBank was used as a washing machine for the stolen loan funds.

83.    NBU conducted a review of the Cyprus branch of PrivatBank as part of its investigation and determined that it was an instrument used to launder money for Kolomoisky and Boholiubov.  NBU found that the branch's assets were overwhelmingly fictional; that the branch's loan portfolio consisted almost exclusively of oversize loans to entities owned and controlled by Kolomoisky and Boholiubov; that the collateral provided was insufficient and did not meet regulatory requirements; and that the purpose of the loans issued by the branch was to hide the ultimate beneficiaries and the source of funds.  NBU determined that the management of PrivatBank's Cyprus branch was controlled by PrivatBank in Ukraine—in other words, by Kolomoisky and Boholiubov.

84.    One example of the Cyprus branch's role in laundering the misappropriated funds is the cycling of the funds disbursed as Loan No. CY001I/4 to Veroni.  On February 4, 2013, $20 million from the loan was disbursed into Veroni's account at PrivatBank's Cyprus branch.  As with the other loans, its purpose and use were misrepresented to the bank.  The purpose was listed

18

as "replenishment of floating assets for payments according to contracts, including for manganese ore." Instead, the funds went to purchase a steel plant in Kentucky. But before the money was transferred to the United States, the loan proceeds were deposited and then withdrawn from the accounts of 13 different shell entities in a total of 17 transactions at PrivatBank's Cyprus branch—all in only 8 minutes. The transactions served no business purpose; they were designed entirely to hide the source and nature of the funds.

85.     The misappropriated funds had been entrusted to the bank by ordinary people and businesses seeking to keep their money in a safe place. PrivatBank offered interest rates above market averages to induce innocent Ukrainian citizens and individuals around the world to entrust their savings to the bank. Kolomoisky and Boholiubov betrayed that trust and took the money for themselves.

86.     The losses caused by Kolomoisky and Boholiubov's fraud and embezzlement were so great that NBU had few options but to nationalize PrivatBank to protect those depositors. If NBU had not, Ukraine's equivalent of the FDIC would have been effectively wiped out.

## II.     Korf And Laber Created A Vast Network Of Companies To Launder The Stolen Money And Invest It In The United States

87.     The laundering did not stop in Cyprus. Kolomoisky and Boholiubov recruited their American counterparts Korf and Laber for the next step. Korf and Laber established a complex system of entities in order to facilitate the laundering of the misappropriated funds, and to invest the funds in property and businesses in the United States.

88.     The companies often used a variation of the name "Optima"—Optima Ventures, Optima Group, etc. The "Optima Family" of companies has a convoluted ownership structure that constantly shifted as new entities were created to move money, disguise ownership of assets, and otherwise launder funds.

89.     The Optima Family included (among many others) the following entities, which were created, owned, or managed by Korf and Laber:

a.      Optima International of Miami, Inc. ("Optima International") was founded by Korf and Laber in 1994.  Korf and Laber were the initial owners, and they sold shares of Optima International and its subsidiaries to entities owned or controlled by Kolomoisky.

b.      Optima Group, LLC ("Optima Group") was incorporated on August 8, 2008 in Delaware.  It is owned[5] by Kolomoisky, Boholiubov, Korf, and Laber.  Korf had authority to direct Optima Group's funds, but discussed those decisions with both Kolomoisky and Boholiubov.

c.      Optima Ventures LLC ("Optima Ventures") was incorporated on January 1, 2008 in Delaware.  Optima Ventures was owned by Kolomoisky, Boholiubov, Korf, and Laber.  It was the primary vehicle used to acquire property in the United States with misappropriated funds from PrivatBank.  Through that activity, it became the largest holder of commercial real estate in Cleveland, Ohio.  Korf and Laber established many entities under Optima Ventures, generally incorporated in Delaware, with which they acquired property using funds misappropriated from PrivatBank, including:

i.      Optima 55 Public Square, LLC, used to acquire the building at 55 Public Square in Cleveland, Ohio.

ii.      Optima One Cleveland Center, LLC, used to acquire the building at One Cleveland Center in Cleveland, Ohio.

---

[5]      Throughout Paragraph 89 and its subsections, "owned" means "ultimately beneficially owned."  Kolomoisky, Boholiubov, Korf, and Laber "owned" entities both directly and indirectly, through a collection of other entities.

iii.      Optima 1375, LLC, used to transfer ownership of One Cleveland Center in 2010.

iv.      Optima 1300, LLC, used to acquire the AECOM Building in Cleveland, Ohio.

v.      Optima 777, LLC, used to acquire the Crowne Plaza Hotel (now known as the Westin Hotel) in Cleveland, Ohio.

vi.      Optima Stemmons, LLC, used to acquire the Stemmons Tower building at 8777 North Stemmons Freeway in Dallas, Texas.

vii.      Optima 7171, LLC, used to acquire the former CompuCom Campus located at 7171 Forest Lane in Dallas, Texas. [6]

viii.      Optima 500, LLC ("Optima 500"), used, as discussed in detail below, to acquire the PNC Plaza building at 500 West Jefferson Street in Louisville, Kentucky.

ix.      Optima 925, LLC, used to acquire the Huntington Building at 925 Euclid Avenue in Cleveland, Ohio.

d.      Georgian American Alloys, Inc. ("Georgian American Alloys") was incorporated on February 14, 2012 in Delaware. Georgian American Alloys was owned by Kolomoisky, Boholiubov, Korf, Laber, and one of their business associates. Approximately 35% of their ownership was through Optima Group.  Georgian American Alloys was the umbrella under which Kolomoisky, Boholiubov, Korf, and Laber owned and managed several ferroalloys producers and traders in the US:

---

6      This property is the subject of a civil forfeiture complaint filed concurrently with this Complaint.

      i.        CC Metals and Alloys LLC, a Delaware company with a ferroalloy plant in Calvert City, Kentucky.

      ii.      Georgian American Alloys Sarl, a Luxembourg entity.

      iii.     Felman Production, LLC ("Felman Production"), a Delaware company with a ferroalloy plant in New Haven, West Virginia.  Felman Production had a bank account at PrivatBank's Cyprus branch, received loans from PrivatBank, and transferred over $225 million to and from entities owned and controlled by Kolomoisky and Boholiubov from 2008 to 2014.

      iv.     Felman Trading Inc., a New Jersey company and global supplier of manganese and ferroalloys.

      e.      Optima Acquisitions, LLC ("Optima Acquisitions") was incorporated on June 25, 2008 in Delaware.  Optima Acquisitions is owned in thirds by Kolomoisky, Boholiubov, and Korf, and was used to acquire companies in the US using money misappropriated from PrivatBank, including Optima Specialty Steel, Inc. and Steel Rolling Holdings, Inc.

      f.      Optima Specialty Steel, Inc. ("Optima Specialty") was a wholly owned subsidiary of Optima Acquisitions created in 2008.  Using Optima Specialty and funds misappropriated from PrivatBank, Korf and Laber acquired or created Michigan Seamless Tube LLC, Niagara LaSalle Corporation, KES Acquisition Company d/b/a Kentucky Electric Steel, and Corey Steel Company.

      g.     Warren Steel Holdings, LLC ("Warren Steel") was incorporated on November 19, 2001 in Delaware.  Warren Steel is owned by Kolomoisky and Boholiubov

and one of their former business partners.  Warren Steel ran a steel mill in Warren, Ohio and was managed by Korf.

h.      Optima 1375 II, LLC ("Optima 1375 II") was incorporated on September 7, 2017 in Delaware in order to receive ownership of One Cleveland Center from Optima 1375.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  The transfer was designed to obscure the ownership of One Cleveland Center and to further disguise the source of the funds for the building.

i.      Optima 925 II LLC ("Optima 925 II") was incorporated on June 4, 2015 in Ohio.  Optima 925 transferred its ownership of the Huntington Building to Optima 925 II, which subsequently merged with a third-party purchaser to acquire the building.  Optima 925 II was created in order to obscure Kolomoisky and Boholiubov's ownership interest in the building.

j.      Felman Trading Americas, Inc. was incorporated in Delaware on April 9, 2018.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  It was created to obscure Kolomoisky and Boholiubov's ownership interest in Felman Trading Inc.

90.     Korf and Laber used the Optima Family's funds as one large pool of money.  They transferred funds back and forth between the different entities, both to launder the money and to try to make money—that is why, for instance, a manganese ore importer paid for the restructuring of a commercial real estate building in Kentucky.  Korf discussed those transfers with Kolomoisky and Boholiubov, and they approved the use of the money.

91.     There are many examples of this "slush fund" approach to related business entities (which was similar to Kolomoisky and Boholiubov's approach to PrivatBank).  On one occasion, Korf directed that Optima Acquisitions loan approximately $19 million to Warren Steel.  When the loan came due, Korf, with the approval of Kolomoisky and Boholiubov, issued new loans from another related entity to pay back Optima Acquisitions.

92.     In yet another example, Optima Ventures loaned money to Warren Steel, which then took a loan from Felman Trading Inc. to pay back the initial loan.

93.     Those inter-entity loans for tens of millions of dollars occurred despite it not being the entities' business to make loans to other companies.

94.     The transactions allowed Kolomoisky, Boholiubov, Korf, and Laber to launder the money, to promote the continued misappropriation of funds from PrivatBank, and to disguise the ownership, nature, and source of funds.

95.     A majority of the members of the Optima Family of companies had their principal place of business at the same suite of offices at 200 South Biscayne Boulevard in Miami, Florida.  As Korf and Laber's resources expanded, they moved from the 30th floor to the 36th and finally the 55th floor—the penthouse.

96.     Korf and Laber played critical roles in the scheme to launder proceeds of unlawful activity.  They interacted directly with PrivatBank management, including Manager 1, Manager 2, and Manager 3 (head of the PrivatBank Credit Committee), regarding loans.  They requested loans for Optima Family members and received them.

97.     And Korf and Laber benefitted from their roles in the scheme.  In certain instances, misappropriated funds from PrivatBank went into Korf and Laber's personal accounts.  For instance, from September 2009 through April 2010, over $13 million was transferred from Optima

International's account to accounts in the name of Korf, Laber, and their families. And funds from Optima International were used to pay for Korf and Laber's personal expenses. Some of those funds had been misappropriated from PrivatBank.

98.     Korf and Laber took many steps to hide the identity and ownership of their "partners," and the fact that the money they spent under the Optima name had initially come from PrivatBank loans. Among other things, they (1) made quick transfers of funds among entities, which served no business purpose; (2) used misleadingly similar names of entities and changed those names with no legitimate business purpose around the time that Kolomoisky and Boholiubov's theft became widely reported; (3) used a convoluted ownership structure of their many entities to hide the true beneficial ownership of assets; and (4) changed the ownership structure of the Optima Family of companies as Kolomoisky and Boholiubov's crimes in Ukraine were made public.

99.     Korf and Laber also had a personal relationship with PrivatBank's management. Laber, for instance, served as a reference for Manager 1 to obtain a US visa. And Manager 3 invited Korf and Laber and their wives to his birthday party.

## III.     Optima Purchased PNC Plaza In 2011 With Funds Misappropriated from PrivatBank

100.    In late 2010, Korf, Laber, Kolomoisky, and Boholiubov expanded their portfolio of US assets with the purchase of PNC Plaza, located at 500 West Jefferson Street in Louisville, Kentucky. Built in 1971, it had 30 floors comprising over 600,000 square feet of office and retail space. The building was in the central business district, only a block from the courthouse, and came with tenants.

101.    PNC Plaza was owned by Louisville Brookdale Partners LLC and Jefferson Corporate Center LLC.

102.    To acquire the property, Korf created a holding company, Optima 500 LLC, which was formed in Delaware on September 10, 2010, and registered in Kentucky on September 24, 2010.  The registration listed the address as 200 South Biscayne Boulevard, Miami Beach, Florida. The sole member and owner of Optima 500 was Optima Ventures, and the paperwork was signed by Korf.  As noted above, Optima Ventures was one of Kolomoisky and Boholiubov's main investment vehicles in the US.

103.    In September 2011, Optima 500 purchased PNC Plaza for $77,050,000.[7]  Korf signed the paperwork.

104.    The purchase included three components.  First, on November 12, 2010 and March 2, 2011, Optima Ventures made deposits totaling $3.5 million as part of the purchase contract. That money originated from a host of other Optima Family members:  Optima Acquisitions ($1,690,000), Optima 1300 LLC ($900,000), Optima 925 LLC ($390,000), Optima Stemmons LLC ($190,000), Optima 1375 LLC ($100,000), and Optima Management Group LLC ($30,000). The remaining $200,000 came from Pavanti.  The money was aggregated in the Optima Ventures account through a series of 11 transfers before being used for the deposit.  That amalgamation was part of a pattern; the use of funds from multiple Optima entities in seemingly random amounts was designed to obscure the source and nature of the funds, as well as the ownership of the building.

105.    Second, on September 21, 2011, Optima 500 assumed the outstanding mortgage on the property, which was $65,700,000.  The mortgage assumption agreement was signed by Korf and notarized on September 16, 2011 in Miami-Dade County, Florida.

---

[7]    The agreed-upon purchase price was $80 million, but there were approximately $3 million of credits and adjustments at closing.

106.    Third, on September 22, 2011, Optima 500 transferred $13,151,167.17 to Progressive Closing & Escrow, which covered the remainder of the purchase price, as well as closing costs and fees.

107.    The $13,151,167.17 used to complete the purchase of PNC Plaza was misappropriated from PrivatBank via two fraudulent loans:

**A.    Fraudulent Loan No. 4Z10330D.**

108.    The first was loan number 4Z10330D for $9,300,000.  That loan was a line of credit that could be drawn on throughout the life of the loan.  The loan application in the name of ZFZ, which was owned by Kolomoisky and Boholiubov, was submitted on November 29, 2010—just over two weeks after Optima 500 had made the initial deposit on the property.  The purpose identified in the (single page) loan application was "funding current operations," and the "primary activity" of those operations was identified as "ferroalloy production."  The application stated that the "source of funds for loan repayment" would be "revenue from primary business."  In other words, the loan application stated that ZFZ, a ferroalloy producer, needed the loan for the production of ferroalloys, and it promised to repay the loan with revenue from that activity.

109.    A "Feasibility Study of Loan Repayment," which accompanied the application, made the same representations: that the purpose of the loan was for "[o]perational activity financing," that the "primary activity" was "[f]erralloy production," and that the loan would be repaid from "revenue generated by the company."

110.    Section 2.2.1 of the Loan Agreement required that the borrower, ZFZ, "[u]se the loan for the purposes set forth" in the agreement, which was for "funding regular operations" of the "Ferroalloy Plant."

111.    On November 30, 2010, only a day after the loan application was submitted, PrivatBank's electronic credit committee approved the $9.3 million loan.

112.    The representations on the application, the feasibility study, and the agreement were false.

113.    First, they misrepresented the purpose of the loan.  Rather than the money being used by ZFZ for its "primary activity" of ferroalloy production in Ukraine, $3,658,273 was used by Optima 500, a completely unrelated entity, to buy commercial real estate in the United States. The funds were sent from PrivatBank through a network of companies in a series of transactions within the span of three days before being used to purchase PNC Plaza.

114.    Second, they misrepresented the source of repayment of the loan.  The loan was not repaid solely using ZFZ's current assets or revenue from its ferroalloy activities.  Instead, portions were repaid with additional loans from PrivatBank.  During the life of the line of credit, $7.8 million was paid off using three other fraudulently obtained loans.  Rather than ZFZ putting money back into PrivatBank, the bank's own money was moved from one account to another to disguise the hole in the bank's books.

115.    Third, they misrepresented the collateral for the loan.  The collateral pledged was "the right to receive goods under purchase and sale contracts with Chemstar Products LLC" ("Chemstar"), totaling $16,637,000.  Chemstar is an entity owned by Boholiubov that was used to launder many of the fraudulent loans.  No specific dates or contract numbers were included in the description of the collateral as part of the application.

**B.    Fraudulent Loan No. 4N11415D.**

116.    The bulk of the funds for the purchase of PNC Plaza, however, came from a second loan.  On September 12, 2011, only 10 days before Optima 500 acquired the property (and after

Optima 500 had deposited $3.5 million for the purchase), an application for a line of credit of $13.5 million was submitted to PrivatBank, purportedly on behalf of NZF, which was owned by Kolomoisky and Boholiubov.

117.    Once again, the application stated that the primary purpose was "[f]unding ongoing operations," which were defined as "production of ferroalloys."  The "[s]ources for repaying" the loan were described as "[r]evenue from the principal line of business."

118.    The single page "Feasibility Study" submitted with the application listed the same information, but added a secondary line of business: garment production.

119.    The loan agreement again stated that the purpose of the loan was funding ongoing operations, for a ferroalloy plant, and required that the loan be used for that purpose.

120.    On September 19, 2011, a week after the loan application was submitted, PrivatBank's electronic credit committee approved the $13.5 million loan.

121.    As with the previous loan, the application, feasibility study, and agreement included several misrepresentations.

122.    First, they misrepresented the purpose of the loan.  On the same day the loan was issued, the money was transferred from the NZF loan account at PrivatBank, combined with the money from loan number 4Z10330D, and three days later, was used by Optima 500 to purchase PNC Plaza.

123.    Second, they misrepresented the source of repayment of the loan.  Again, some of the line of credit was repaid with the proceeds of additional loans.  During the life of the line of credit, $6.2 million was paid off using three other fraudulently obtained loans.

124.    Third, they misrepresented the collateral for the loan.  Internal notes stated that the collateral was "stock in trade"—in this case, manganese ore that the entity supposedly would buy

and sell—and that it was insufficient to cover the loan.  The notes further stated that there would need to be negotiations with the company to increase the amount of collateral.  Nevertheless, the loan was approved the very day those deficiencies were noted.

      **C.     Laundering the Proceeds of Fraudulent Loan Nos. 4Z10330D and 4N11415D.**

125.    Before being used to purchase PNC Plaza, the money from Loan Nos. 4Z10330D and 4N11415D was combined, divided, and transferred through multiple companies' bank accounts to hide its source, and the fact that it was fraudulently obtained.

126.    On September 19, 2011, at 4:36 PM, $3,658,273 from the line of credit established as Loan No. 4Z10330D was transferred from ZFZ's PrivatBank loan account into a different ZFZ account.

127.    Also on September 19, 2011, at 7:00 PM, $11,116,246 from the line of credit established as Loan No. 4N11415D was transferred from NZF's PrivatBank loan account into a different NZF account.

128.    Within a few hours of those initial transfers, the funds were sent outside Ukraine and combined in accounts at PrivatBank's Cyprus branch.  On September 19, 2011, between 5:38 and 5:39 PM, $3,658,273 from the ZFZ line of credit was transferred from ZFZ's account to an account in the name of Chemstar at PrivatBank's Cyprus branch.  And at 7:14 PM, $11,116,246 from the NZF line of credit was transferred from an NZF PrivatBank account to the same Chemstar account.

129.    The next day, on September 20, 2011, a portion of the fraudulently obtained loan funds were moved through several accounts at PrivatBank Cyprus, only to be returned to the Chemstar account.

a.      At 5:02 PM, $1,330,000 of the ZFZ loan proceeds was transferred from the Chemstar account to an account in the name of Divot Enterprises Limited ("Divot") at PrivatBank's Cyprus branch.  Divot is a shell company ultimately beneficially owned by Kolomoisky.

b.      At 5:16 PM, the $1,330,000 was comingled with other funds and was transferred to an account at PrivatBank Cyprus in the name of Logarinvest Limited ("Logarinvest"), which is a shell company ultimately beneficially owned by Kolomoisky.

c.      At 5:37 PM, the money was again comingled with other funds, and transferred from the Logarinvest account to an account at PrivatBank Cyprus in the name of Demeter Diversified LLC ("Demeter"), a shell company ultimately beneficially owned by Kolomoisky and Boholiubov.

d.      Finally, at 6:32 PM, the funds were transferred back to Chemstar's account at PrivatBank Cyprus.

130.    Two days later, on September 22, 2011, the fraudulently obtained loan funds took a convoluted journey to the United States.

a.      At 6:17 PM, $18,260,000, which included the loan funds, was transferred from Chemstar's account to Divot's account at the Cyprus branch of PrivatBank.

b.      At 6:54 PM, Divot transferred $15,600,000 to an account at PrivatBank Cyprus in the name of Kadis Holding Limited ("Kadis"), a shell company ultimately beneficially owned by Kolomoisky.

c.      Seconds later, also at 6:54 PM, Kadis transferred the $15,600,000 to an account at PrivatBank Cyprus in the name of Pavanti.

d.      At 7:04 PM, Pavanti transferred $15,600,000 in two separate transaction to an account at Regions Bank in the United States in the name of Optima Ventures.  The memo lines read: "For OPTIMA VENTURES LLC 0077605470 for PAYMENT ACCORDING TO LOAN AGREEMENT NO. 2 DATED 21/09/2011" and "For OPTIMA VENTURES LLC 0077605470 for PAYMENT ACCORDING TO LOAN AGREEMENT NO. 1 DATED 21/09/2011."  Prior to that transfer, Optima Ventures' account had a balance of less than $3,000.

131.    The same day the funds were transferred into Optima Ventures' account, Optima Ventures sent $13,151,167 to Progressive Closing & Escrow.[8]

132.     On September 22, 2011, loan money that ostensibly had been provided to fund ongoing operations of Ukrainian steel plants was used to purchase PNC Plaza in the name of Optima 500, which had no relationship with either ZFZ or NZF.

133.    Kolomoisky and Boholiubov's applications for, receipt of, and use of Loan Nos. 4Z10330D and 4N11415D constituted embezzlement and conversion of PrivatBank's money. They also constituted a fraud by and on PrivatBank.  The transfers of the money from Ukraine to Cyprus to the US were transfers in international commerce and constituted money laundering.  The purchase of PNC Plaza also constituted both a transfer and receipt of the misappropriated funds in international commerce and money laundering.

---

[8]      Another approximately $1 million of the fraudulently obtained loan funds was sent to other Optima entities on the same day: $750,000 to accounts of Optima 1300 LLC, Optima 1375 LLC, and Optima 55 Public Square LLC (which was used as a down payment on the Crowne Plaza Hotel in Cleveland) and $252,000 to accounts of Optima 925 LLC, Optima Harvard Facility LLC, and Optima Management Group LLC.  The remaining roughly $1 million, in combination with an infusion from Felman Trading Inc., was used to complete the purchase of the Crowne Plaza Hotel on October 5, 2011.

134.   The intermediate transfers of the proceeds of the embezzlement and fraud served no legitimate business purpose.  They were designed to conceal and disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

## IV.   Optima Restructured The Ownership Of PNC Plaza In 2018 To Further Launder The Misappropriated Funds

135.   On March 13, 2017, Optima 500 defaulted on the mortgage it had assumed in acquiring PNC Plaza.

136.   At the time of default, there was an outstanding principal balance of $61,189,224.40, with a total outstanding balance, including interest and penalties, of $65,106,639.31.

137.   On January 31, 2018, U.S. Bank, as a trustee for the mortgage holders, filed a foreclosure action in the courts for the Commonwealth of Kentucky.

138.   A receiver for Optima 500 was appointed by the court on February 5, 2018 to manage the property during the foreclosure proceedings.  As of the Receiver's first report, PNC Plaza was 66.1% occupied, and the total cash balances were just under $400,000.  Within a few months, the cash account increased to over $1.8 million.[9]

139.   To stave off foreclosure, Korf and Laber entered negotiations with a third-party investment firm, Firm A.[10]  Eventually, they agreed to enter a joint venture that altered the ownership structure of PNC Plaza.

---

[9]   From 2011 to 2018, roughly $2 million was transferred from Optima 500's account to Optima Ventures.

[10]   Firm A was an unrelated third-party investor, which, on information and belief, had no connection to the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank.

140.     To facilitate the restructuring, Korf and Laber created a new network of entities. On August 7, 2017, they formed Optima CBD Investments LLC ("Optima CBD") in Delaware. According to Korf and Laber, they each owned 50% of the entity.

141.     They then formed CBD 500 LLC ("CBD 500") on September 5, 2018 in Delaware. Optima CBD owned 100% of the entity, and Laber signed the relevant founding documents.

142.     The ownership structure of Optima CBD facilitated the laundering of the fraudulently obtained and embezzled loan proceeds.  Optima CBD was nominally separate from Kolomoisky and Boholiubov's ownership, but in practice it was no different from the other members of the Optima Family.  Business records for Optima CBD were held at 200 South Biscayne Boulevard, Suite 5500 in Miami, along with Optima Ventures and Optima 500.

143.     Firm A created two entities as part of the joint venture structure: MTP – PNC Plaza Manager LLC, which served as a non-member manager, and MTP – PNC Plaza LLC, which had a stake in the joint venture.[11]

144.     Together, Korf and Laber's CBD 500 and Firm A's MTP – PNC Plaza Manager LLC and MTP – PNC Plaza LLC formed PNC Corporate Plaza Holdings LLC, a Delaware company, on September 5, 2018.  Under that joint venture entity, they formed 500 West Jefferson Street LLC, also a Delaware entity, to hold PNC Plaza.  CBD 500 held 95%; Firm A held 5%.

145.     As part of the joint venture operating agreement, Korf and Laber certified that none of the money or property contributed to the joint venture was derived from or related to criminal activity.

---

[11]     The United States does not seek the forfeiture of any interest owned by MTP – PNC Plaza LLC.

146.    On October 10, 2018, Firm A entered into an agreement with US Bank to purchase the promissory note on PNC Plaza—which provided the right to receive mortgage payments and the ability to foreclose on the property in case of default—for approximately $27 million.  That was a steep discount to the approximately $65 million still owed by Optima 500 on the mortgage.

147.    Firm A transferred the promissory note purchase agreement to 500 West Jefferson LLC for $25,750,000 on December 11, 2018.

148.    Through these transactions, almost $40 million of debt had been erased.  Korf and Laber went from *owing* $65 million through Optima 500 to *owning* the right to foreclose on PNC Plaza through 500 West Jefferson, in which they held a 95% stake.

149.    Korf and Laber, through Optima 500, transferred ownership of PNC Plaza to 500 West Jefferson LLC by the transfer of a Deed in Lieu of Foreclosure, which extinguished the original promissory note.[12]  The property thus was still under their control, but via a different entity, and most of the debt was gone.  They converted their ownership of the building into ownership of a note, and then turned it back into ownership of the building—transferring the proceeds of the initial misappropriation and involving the building, used as collateral, in that transfer.

150.    The purchase of the promissory note for approximately $27 million was funded in two parts.  First, the joint venture entity 500 West Jefferson took a loan of approximately $17 million from Lender A, a third-party lender.  Second, Korf and Laber (via Optima CBD Investments LLC) and Firm A (via MTP – PNC Plaza LLC) contributed approximately $10

---

[12]    The receivership was terminated on January 9, 2019, but the parties agreed to have the Receiver continue management through February 2019 while preparations were made.

million.  Optima CBD Investments was responsible for 95% of the capital contribution, per its operating agreement with Firm A, or $9.5 million.

151.    The money Korf and Laber contributed came from a different entity: Felman Trading Americas Inc.

152.    Felman Trading Americas Inc. was used to hide the involvement of Kolomoisky and Boholiubov in the ownership of PNC Plaza.  Although Felman Trading Americas Inc. was nominally distinct from Felman Trading Inc. (which was owned approximately 45% each by Kolomoisky and Boholiubov, and 5% each by Korf and Laber), in practice the two entities were treated indistinguishably.  Money for both entities was paid into the same bank account.  Shipments of manganese ore seamlessly transitioned, during 2018, from Felman Trading Inc. to Felman Trading Americas Inc., and the flow of goods never stopped.  Their offices were collocated (along with those of Optima Ventures); their management was the same.  They shared a registered agent.  And Felman Trading Americas Inc. transferred funds to Optima entities owned by Kolomoisky and Boholiubov, including Optima Ventures.  They were, for all intents and purposes, one entity.

153.    Following the restructuring of the PNC Plaza debt, Korf and Laber injected more money into PNC Plaza from another newly minted Optima entity: Optima 1375 II LLC.  That entity held One Cleveland Center, having received it from Optima 1375.  Like the transition from Felman Trading Inc. to Felman Trading Americas Inc., the addition of the "II" to Optima 1375 allowed Korf and Laber to hide Kolomoisky and Boholiubov's involvement.  Korf and Laber also received distributions of approximately $2.4 million from Optima 1375 II via Optima CBD Investments' bank account.

154.    The name games were designed to conceal and disguise the nature, location, source, ownership, and control of PNC Plaza and the funds that had been used to purchase, restructure, and run it.

155.    When, as part of due diligence, representatives of Firm A asked for information about the ownership structure of Felman Trading Inc. and Optima 1375, they were only provided the ownership structure of Felman Trading Americas Inc. and Optima 1375 II, which effectively hid the role of the Ukrainian oligarchs, whose fraudulent activities with PrivatBank had been made public.[13]

156.    The use of funds purportedly from Felman Trading Americas Inc. and Optima 1375 II allowed Korf and Laber to continue owning the property, which had been purchased using approximately $13.1 million in stolen money.  The purpose of the restructuring transactions was to retain the asset constituting the proceeds of the misappropriation from PrivatBank, while also concealing and disguising the nature, location, source, ownership, and control of the misappropriated funds.

**V.      Korf And Laber Planned To Sell PNC Plaza To Further Launder The Loan Proceeds**

157.    In late 2019, Firm A made an offer to purchase PNC Plaza from Korf and Laber, which Korf and Laber accepted, allowing them to convert the proceeds of the earlier embezzlement and fraud (PNC Plaza) back into liquid assets (money from Firm A).

158.    On July 17, 2020, Korf and Laber (through the joint venture entity, 500 West Jefferson) and Firm A (through a new holding entity, MTP – 500 West Jefferson LLC) entered into

---

[13]      From 2008-2014, Felman Trading Inc. received almost $7 million from, and transferred almost $400 million to, Kolomoisky and Boholiubov-related entities via PrivatBank.

an agreement to sell the property to Firm A for $25 million.  The price was reduced to $22.25 million on July 23.

## FIRST CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(C)

159.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

160.    The Defendant Asset is property that constitutes, or is derived from, proceeds traceable to (i) a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (ii) the international transportation and transfer of stolen, converted, or fraudulently obtained money or property valued over $5,000 (18 U.S.C. § 2314); and (iii) the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), all of which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1956(c)(7)(B)(iii), or a conspiracy to commit such offenses.

161.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

162.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

163.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957.  Specifically,

the Defendant Asset is involved in or is traceable to monetary transactions in criminally derived property of a value greater than $10,000, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

164.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

165.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

166.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(A)(i). Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and with the intent

to promote the carrying on of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

167.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

168.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

169.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

170.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

171.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

172.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(A). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and with the intent to promote the carrying on of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

173.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

174.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

175.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

176.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SEVENTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

177.    Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

178.    The Defendant Asset is involved in, or is traceable to property involved in, a conspiracy to launder the proceeds of specified unlawful activities in violation of 18 U.S.C. § 1956(h).

179.    Specifically, the Defendant Asset is involved in, or is traceable to funds that were involved in, a conspiracy:

a.    To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315);

b.    To engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1957; and

c.    To transport, transmit, or transfer to a place in the United States from or through a place outside the United States, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities,

that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

180.     Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, Plaintiff, the United States of America, requests:

1.     The Defendant Asset be proceeded against according to the law and the rules of this Court, and that due notice be given to all the interested parties to appear and show cause why forfeiture should not be decreed.

2.     The Court, for the reasons set forth herein, adjudge and decree that the Defendant Asset be forfeited to the United States of America and disposed of in accordance with existing laws, together with costs, and for such other relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

The United States hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

DATED: August 6, 2020        DEBORAH CONNOR, CHIEF
MONEY LAUNDERING & ASSET RECOVERY
  SECTION

By:    /s/ *Shai D. Bronshtein*
Shai D. Bronshtein, Trial Attorney (ID No. A5502665)
Michael C. Olmsted, Senior Trial Attorney
Peter Steciuk, Trial Attorney
Mary Butler, Chief, International Unit
Criminal Division
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 616-5950
Shai.Bronshtein@usdoj.gov
ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

*/s Adrienne E. Rosen*
Adrienne E. Rosen
Assistant United States Attorney
Court ID No. A5502297
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9338
Adrienne.Rosen@usdoj.gov

45

**VERIFICATION**

Matthew M. Hoke, being of legal age, verifies, and pursuant to 28 U.S.C. § 1746(2), declares and states as follows:

1.      I am a supervisory special agent with the FBI and am assigned to the investigation in this case.

2.      I have reviewed the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true.

3.      The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation of this case, together with others, as a special agent.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6, 2020


_____
Matthew M. Hoke
Special Agent

1